
Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 CR 296 | **DATE** | 8/30/2000 |
| **CASE TITLE** | USA vs. Robert T. Cechini, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for judgment of acquittal or in the alternative for a new trial is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 5 number of notices | Document Number |
| | No notices required. | | | |
| X | Notices mailed by judge's staff. | | AUG 3 1 2000 date docketed | |
| | Notified counsel by telephone. | | | |
| ⚡ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 8/30/00 date mailed notice | |
| | Copy to judge/magistrate judge. | ED-7 FILED FOR DOCKETING 00 AUG 30 AM 11: 06 | | |
| RO | courtroom deputy's initials | Date/time received in central Clerk's Office | Ro mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
) Judge Ruben Castillo
v. )
) No. 99 CR 296
)
ROBERT T. CECHINI and )
LARRY SCIALABBA, )
)
Defendants. )

**DOCKETED AUG 3 1 2000**

## MEMORANDUM OPINION AND ORDER

On April 13, 2000, Robert T. Cechini and Larry Scialabba were convicted by a jury on gambling, money laundering and tax evasion charges. Currently before the Court is Defendants' motion for judgment of acquittal or in the alternative for a new trial. Defendants' post-trial motion focuses entirely on their money laundering convictions. Because the evidence is sufficient to sustain Defendants' money laundering convictions, we deny Defendants' motion.

## RELEVANT FACTS

Cechini was the owner and president of OK Amusement ("OK"), which employed Scialabba. OK's business involved leasing video gambling machines from Rent-All Amusement Company ("Rent-All") and Universal Amusement Company ("Universal"). Working in unison, Cechini and Scialabba placed these leased video gambling machines in bars and restaurants. Cechini and Scialabba then taught the owners, managers, and employees of those respective bars and restaurants exactly how to use the video gambling machines. In particular, Defendants taught them how much to pay out to winning customers, how to clear the machines after making such payments, and that they should only pay money to customers they knew well and trusted.

This unlawful activity resulted in a considerable amount of money for all parties involved.

Cechini and Scialabba utilized the money in various financial transactions, including: (1) making weekly cash rental payments to Rent-All and Universal; (2) splitting weekly proceeds from the unlawful activity between the bar/restaurant representatives and OK; and (3) paying licensing fees to the State of Illinois Department of Revenue to obtain legally required decals for display on the machines.

## LEGAL STANDARDS

Motions for acquittal should be granted only where "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). All of the reasonable inferences that can be drawn from the evidence are reviewed in the light most favorable to the government. *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984). Furthermore, the inference of a defendant's guilt of a criminal offense may be established by either direct or circumstantial evidence, and circumstantial evidence is of equal probative value to direct evidence. *United States v. Towers*, 775 F.2d 184, 188 (7th Cir. 1985).

## ANALYSIS

In support of their motion, Cechini and Scialabba argue that the government failed to prove: (1) that the financial transactions sufficiently affected interstate commerce; (2) that the financial transactions involved the proceeds of gambling; and (3) that the financial transactions promoted gambling. The Court's analysis indicates that these arguments are not supported by the trial evidence or relevant case law.

## I. Effect On Interstate Commerce

### A. Meaningful v. De Minimis Effect

Under the Commerce Clause, an activity may be regulated provided that, in the aggregate, there is a substantial effect on interstate commerce. *Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942). Defendants maintain that under *United States v. Lopez*, 514 U.S. 549 (1995), the government must prove that *each* transaction had a substantial effect on interstate commerce. The Seventh Circuit, however, rejected this argument in *United States v. Laurenzana*, 113 F.3d 689, 692 (7th Cir. 1997), explaining that, to meet the interstate commerce requirement under 18 U.S.C. § 1956, "the connection to interstate commerce required for a money laundering offense need only be incidental to the transaction or . . . interstate commerce must be affected only in some manner. *Id. See also United States v. Ables*, 167 F.3d 1021, 1030 (6th Cir. 1999) (government need only prove that the prohibited transactions had a de minimis effect upon interstate commerce); *United States v. Westbrook*, 119 F.3d 1176, 1191-92 (5th Cir. 1997) ("§ 1956 regulates activities that, *in the aggregate*, have a substantial effect on interstate commerce").

Cechini and Scialabba cite *Jones v. United States*, 120 S. Ct. 1904 (2000) and *United States v. Morrison*, 120 S. Ct. 1740 (2000), to support their argument that the government has not met the interstate commerce requirement. Those cases are easily distinguished. First, neither of them deals with 18 U.S.C. § 1956. The *Jones* Court held that a private residence, not used for any commercial purpose, did not fall within the coverage of the federal arson statute because arson is a paradigmatic common law state crime. Thus, the Court explained, subjecting the defendant to federal prosecution under the federal arson statute would affect the federal-state

balance in the prosecution of crimes. No such concern exists in this case because § 1956 is an offense clearly understood to substantially affect interstate commerce. In addition, *Morrison* is distinguishable because, the statute at issue in that case, the Violence Against Women Act, had nothing to do with commerce or economic activity.

## B. Effect of Financial Transactions on Interstate Commerce

The government proved that Cechini and Scialabba's prohibited transactions had the required de minimis effect on interstate commerce in the following well-recognized manners.

### 1. Monies Deposited in an FDIC-Insured Institution

Evidence of transactions involving financial institutions insured by the Federal Deposit Insurance Corporation ("FDIC") is sufficient to meet the interstate commerce requirements under § 1956. *United States v. Ladum*, 141 F.3d 1328, 1339 (9th Cir. 1998). *See also United States v. Trammell*, 133 F.3d 1343, 1353 (10th Cir. 1998) (acceptance of checks from financial institutions insured by the FDIC is sufficient to meet § 1956 interstate commerce requirement).

Cechini and Scialabba maintain that because they, themselves, did not deposit the money into an FDIC-insured institution, the required effect on interstate commerce was not met. Such a restrictive view of §1956 was specifically disapproved in our circuit. *Laurenzana*, 113 F.3d at 690. In *Laurenzana*, the defendant was convicted of conspiracy to commit money laundering. *Id.* On appeal, Laurenzana alleged that his payment of co-conspirator Gilmore's cash bond had no effect on interstate commerce. *Id.* at 692. Laurenzana maintained that his payment of Gilmore's bond resulted in three distinct transactions: (1) Laurenzana paid the cash to the Deputy Sheriffs; (2) the Sheriff's office turned over the money it collected to the Morgan County Circuit Clerk's office; and (3) the Clerk's office deposited the money in a bank. *Id.* Laurenzana asserted

that his payment of the bond, which was only the first of the three transactions, did not affect interstate commerce. This argument, however, was squarely rejected by the Seventh Circuit.

In the present case, Cechini and Scialabba made payments to Rent-All/Universal, the bar/restaurant owners, and the State of Illinois. The payments made by Cechini/Scialabba ultimately ended up in an FDIC-insured institution. Cechini and Scialabba would like this Court's analysis to stop with their delivery of cash to Rent-All/Universal, the bar/restaurant owners, and the State of Illinois. However, as the Seventh Circuit articulated in *Laurenzana*, "[N]either commerce nor the flow of cash is a static process." *Id.* Therefore, the fact that proceeds from the gambling activity ultimately ended up in an FDIC-insured institution is sufficient to meet § 1956's interstate commerce requirement.

### 2. Transactions With Rent-All

A corporation is generally engaged in commerce when it is itself directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce. *United States v. Robertson*, 514 U.S. 669, 672 (1995). Cechini and Scialabba leased their video gambling machines from Rent-All, which regularly purchased goods and services from outside of Illinois. Therefore, Cechini and Scialabba's transactions with Rent-All affected interstate commerce. *See United States v. Harty*, 930 F.2d 1257, 1262 (7th Cir. 1991) (robbery of a race track, which attracted out-of-state participants and customers, affected interstate commerce); *United States v. Kelley*, 929 F.2d 582, 585 (10th Cir. 1991) (purchase of an automobile manufactured in a different state is sufficient to meet interstate commerce requirements).

*United States v. Pickney*, 85 F.3d 4 (2d Cir. 1996), which Cechini and Scialabba rely on, is unpersuasive. In *Pickney*, the court found that the inability of a witness to state that the

5

company in question was located outside of the state rendered his testimony insufficient to demonstrate an effect on interstate commerce. In contrast, in the present case, the testimony of a former Rent-All/Universal employee established that Rent-All/Universal regularly purchased goods and services from outside of the State of Illinois. We find that the testimony in the present case is sufficient to demonstrate an effect on interstate commerce.

### 3. Proceeds Split With Bar/Restaurant Owners

The government argues that the splitting of the proceeds from the video gambling machines also had an effect on interstate commerce. The government notes that when Cechini/Scialabba or the bars/restaurants received money during the splitting of the cash proceeds they had more money to spend on goods manufactured out of state. Cechini/Scialabba also had more money to rent additional video gambling machines from Rent-All/Universal and the bars/restaurants had more money to spend on alcoholic beverages.

A business that regularly purchases goods or services from outside the state in which it is located is a business engaged in interstate commerce. *Robertson*, 514 U.S. at 672 (1995). In the present case, Cechini/Scialabba and the bars/restaurants used the proceeds from the unlawful gambling, in part, to acquire products that were located outside of Illinois. Therefore, under *Robertson*, the splitting of the proceeds from the unlawful activity undoubtedly had an effect on interstate commerce.[1]

---

[1] The government also asserts a "depletion of assets" theory, which we find does not apply to the facts in this case. According to this theory, commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods. *United States v. Blakey*, 607 F.2d 779, 784 (7th Cir. 1979). In the present case, however, the bar/restaurant owners and Cechini/Scialabba were

6

### 4. Payment of Licensing Fees To the State of Illinois

The government maintains that Cechini's annual purchase of license stickers from the State of Illinois had a three-fold effect on interstate commerce. First, cash was supplied to the State of Illinois that could be used, in part, for the purchase of goods and services from outside of the State of Illinois; second, cash was deposited into an FDIC-insured institution; and third, cash was depleted from Cechini, thus reducing his ability to rent video gambling machines from Rent-All/Universal. We will address only the second argument.[2]

Evidence of a transaction involving financial institutions insured by the FDIC is sufficient to meet § 1956's interstate commerce requirements. *Ladum*, 141 F.3d at 1339. Furthermore, "neither commerce nor the flow of cash is a static process." *Laurenzana*, 956 F.2d at 1412. Therefore, as long as monies find their way to an FDIC-insured institution, interstate commerce has been affected. In the present case, Cechini/Scialabba purchased licence stickers from the State of Illinois, which deposited the proceeds into an FDIC-insured institution. Therefore, interstate commerce was affected.

## II. The Financial Transactions Involved the Proceeds of Gambling

Money, once collected from the gambling machines, becomes "proceeds" within the meaning of the money laundering statute. *United States v. Conley*, 37 F.3d 970, 980 (3d Cir.

---

working in unison. Therefore, we conclude a victim was not established within the meaning of the depletion of assets theory.

[2] With regard to the government's first argument, because there is no evidence that the State of Illinois used the proceeds of the licensing fees to purchase goods/services from outside of the state, we will not address the issue. Regarding the government's third argument, for the reasons mentioned in footnote one, the depletion of assets theory does not apply to this case.

1994). Cechini and Scialabba maintain that the proceeds they received from the bar/restaurant owners came from the owners' cash registers, not the upright gambling machines. Thus, Cechini and Scialabba argue that the financial transactions they delved in could not have possibly involved the proceeds of gambling. However, the Seventh Circuit has foreclosed this avenue to Cechini and Scialabba. *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir. 1991). With a fact pattern strikingly similar to the one before this Court today, the *Jackson* court stated "we cannot believe that participants in unlawful activities could prevent their own convictions under the money laundering statute simply by commingling funds derived from both specified unlawful activities and other activities." *Id.* *See also United States v. Suba*, 132 F.3d 662, 674 (11th Cir. 1998) (where funds involved in the transaction are derived from a commingled account of which only a part comes from specified unlawful activities, money laundering convictions can be upheld); *United States v. Jackson*, 983 F.2d 757, 765 (7th Cir. 1993) (Congress indicated that it does not intend for defendants to be able to avoid the sanction of the money laundering statute by commingling funds). In the instant case, Cechini and Scialabba obtained a considerable amount of proceeds from unlawful gambling, and the financial transactions they engaged in involved those illegal proceeds.

Cechini and Scialabba further argue that the government's evidence was insufficient to prove that the financial transactions involved the proceeds of gambling. However, the United States may properly use a wide variety of direct and circumstantial evidence to establish that the proceeds were from a specified unlawful activity. *See United States v. English*, 92 F.3d 909, 916 (9th Cir. 1996); *U.S. v. Blackman*, 897 F.2d 309, 316-17 (8th Cir. 1990).

8

## III. The Financial Transactions Promoted Gambling

Courts have consistently held that proceeds used to pay for goods or services which further the illegal activity may be said to "promote" the illegal activity. *See United States v. Febus*, 218 F.3d 784, 789 (7th Cir. 2000) (a transaction satisfies the promotion provision of the money laundering statute if it constitutes the practice of plowing back proceeds of the illegal activity to promote that activity); *United States v. Masten*, 170 F.3d 790, 797 (7th Cir. 1999) (payment of commissions that helped keep defendant's fraud scheme afloat was sufficient to sustain a money laundering conviction); *Conley*, 37 F.3d at 972-73 (purchase of additional video gambling machines plus the delivery of proceeds to other employees is sufficient to charge a money laundering offense under the promotion branch of 18 U.S.C. § 1956(a)(1)). In the present case, Cechini and Scialabba used the proceeds to attain licence stickers for the gambling machines as well as to rent additional video gambling machines. Undoubtedly, these financial transactions "promoted" the illegal gambling activity.

Cechini and Scialabba's reliance on *United States v. Brown*, 186 F.3d 661 (5th Cir. 1999), is misplaced. The *Brown* court stated that although "in many cases, the intent to promote criminal activity may be inferred from the particular type of transaction," the nature of Brown's business made it difficult for the court to infer that his transactions promoted the criminal activity.[3] *Id.* at 670. In the present case, the basic business enterprise in question, OK, was an illegal gambling business. Since the gambling business was prosperous, it could be readily inferred that: (1) the splitting of the proceeds from the video gambling machines with the

---

[3] In *Brown*, the business enterprise in question was a legitimate business, an auto dealership.

9

bars/restaurants encouraged the owners to keep the machines in their establishments and encouraged their continued use for illegal gambling; (2) the payments to the State of Illinois to attain licenses for the video gambling machines were made with the intent to keep the State of Illinois from seizing the machines; and (3) the payments of rent to Rent-All/Universal were made with the intent to continue the use of the illegal video gambling machines.

## CONCLUSION

This Court easily concludes that there was sufficient evidence supporting the jury's finding that the financial transactions sufficiently affected interstate commerce, involved the proceeds of gambling, and promoted gambling. Therefore, we deny Defendants' motion for judgment of acquittal or in the alternative for a new trial. (R. 71-1.)

ENTERED:

Judge Ruben Castillo
**United States District Court**

**Date: August 30, 2000**